21-2698, Steamfitters Local vs. AT&T. I understand Mr. Lieberman is here for the appellant, is that right? That's correct, Your Honor. And you would like to reserve three minutes for rebuttal. That's correct, Your Honor. So please proceed. Good morning, Your Honor. It's Jeremy Lieberman, Pomerantz LLP, on behalf of appellants. Your Honor, we submit that the District Court committed a reversible error by granting the against plaintiffs. The amended complaint, and more particularly the proposed second amended complaint, detail a vast nationwide scheme whereby salespeople in the company, encouraged by store managers and district managers and directors of sales, sold, without customer's knowledge, programs and DTVN to customers who simply didn't want the product. Either they were being bundled into the product or they simply were, without their knowledge, were given a fake email address and were given this product. This scheme was so vast, detailed by 58 confidential informants- So counsel, I think we understand the general picture, which is helpful, but could you get a little bit more granular, because the District Court's ruling was based on some of the specific statements, right? Whether they were puffery or, for example, with regard to the subscribers, the conclusion that, as alleged, if subscribers were being fraudulently added and deleted in rapid succession, they would not show up in the net monthly numbers of new subscribers, right? So if you could get perhaps more granular and address some of the particular findings in the District Court, that might be more helpful. Sure, absolutely. With respect to the false statements, the company right away, early in the class period, January 20th, 2017, said that they had more than 200,000 video net ads, and they said that these were paying customers. That's a specific representation by the company. Now, we allege that at least between 60% to 90% of those customers were simply fraudulent. But was fraudulent the same thing as not being a paying customer? So if somebody says, we're going to give you a free account, but in fact what they do is they waive the cable fees and actually it's a paid account, but the person has the account, is that not a paid subscriber? Well, not if you don't know that you're getting the product, and particularly not if you're Some of the subscribers didn't know they were getting the product, right? But some people did. Some people were told they were getting a free account and so on. No, our allegations focus on the customers who didn't know they were getting the product, either it was being bundled without their knowledge, or simply they were getting the product without their knowledge via a fake email address. That is what these allegations... So you're saying that it becomes misleading just based on the subscribers who didn't even know they had the product? Subscribers who... So those subscribers who were given, who were told they were getting like a free trial and knew about getting the product, even if it was a fraudulent way to get them into the product, you're saying we can just discount all of those? There's enough customers who had no idea about the product? Yeah, we were speaking specifically about ghost accounts, and this was something spoken about at a nationwide level in meetings... That's what I wanted to ask. Yes. You referred to this as a scheme, as a scheme. Mm-hmm. What is the evidence that this was a scheme orchestrated from the top, as it were? You are... Fair enough. It may have been a ground level situation where... Well, if it's a ground level situation, that means that individual employees or even store managers are engaged in some effort to bulk up the numbers because that might get them a personal bonus. Because... At what point, where is the evidence that at some point the management became aware of what you are alleging is a vast scheme, as opposed to maybe even hundreds of individuals that they eventually fire? Because it created, in the middle of 2017, a nationwide internal investigation, and that was that... That resulted in the firing of a certain number of people. But what is the evidence that... So at that point, what is supposed to happen? They're supposed to announce publicly that we fired a whole bunch of people. I suppose they did that, more or less. Are they supposed to announce, we now know that the number of new accounts for this quarter should be discounted by X percent? Sure. If you say... How would they know that? Because if you have a million customers and only 200,000 are actually using the account... How do you know that they're using the account? But I have lots of accounts for streaming this and streaming that, which I got for, you know, I wanted to watch, whatever, the World Cup. And then it sits there, and it's not that much per month, and maybe something else will come up, and there's zero... But at some point, it raises a red flag, particularly according to CW 34. Why? If I look at my bills every month, I think very often I should cancel six of these because I haven't used it in six months, and I don't. Fair enough, Your Honor. And I'm still paying. But here you have an internal... This kind of rose to the level of an internal investigation. Right, and they acted on the... But they never disclosed to the market there was an internal investigation. All they said from 2017, quarter after quarter, is we have a million subscribers. We have 1.5 million. But how do you know that they fired all these people? That's what our CWs tell us. Over 1,000 were fired. I see. That's alleged. Over 1,000 are fired. And we have a CW saying that they had access to the internal... It can be kind of a jump between the fraudulently created accounts and the inactive accounts, right? So even if they knew that some number of accounts were inactive, couldn't a lot of accounts that were not fraudulently created be inactive? That's true. In fact, doesn't the district court say they had a very aggressive promotional scheme to promote subscriptions to DTVN? And one risk of that is that a lot of people would subscribe and not really engage with the product. But at some point, when you have 97% are not using the product, that raises a red flag. And we have... What is exactly the information that 97% of the customers did not use the product? We have, according to CW 34, the usage reports showed that 97%... Give us a page number in the appendix. Sure. I have my CW 34. Oh, hang on. I'm so sorry. It's appendix number 715. Paragraphs 847 to 48. I'm sorry, what was that page number again? Appendix 715 and also pages 847 to 48. Paragraphs 116, 535, and 537. It's the account of CW 34. Okay, you got to give us again the page... The second page number and the paragraph numbers. I got appendix number 715. Yeah, 715 just says who CW whatever where he worked. Okay, and then pages 847 to... And then 847 to 48. Okay, and what paragraphs there? Hang on one second. And then it's 535 and 537. Yeah, I mean, but then he just said, At any given time, senior executives in the corporate offices could access the usage report. I mean, that doesn't really help. I mean, isn't that presumably true of any information owned by the corporation? At any given moment, I assume, a CEO of a corporation could say, you know, bring me this information. But that information is... How do you attribute that to anyone in particular? No, but Stevenson said he was monitoring the information. He made multiple statements during the class. He said he's monitoring the usage report? He said he was getting weekly reports on usage and on subscriber information on trim rate. And 34 says at one time, unspecified time, around 97% were not being used. Clearly, this rose to the level of a... Can I ask you this question? So let's say that actually there was no fraudulent scheme. It's just that the people who were signed up legitimately were not engaging with the product. And so most users were inactive. And so you get these reports, and it says 97% of the users are not engaging with the product. But the company still has said that they have a lot of subscribers. Would that be a misstatement? It may be, particularly when they said they're not promotional customers, when they said they're paying customers. That's key. But why would that be a misstatement if, in fact, they paid and then they just didn't engage with the product? Well, true, but they also make a statement that they're not promotional. That's the beginning of the class where they say that these are not promotional numbers. No, no, I understand. But in my hypothetical, they're not promotional. They're just a lot of people who signed up for the product. And don't use it? And decided they didn't really like it, and so they don't use it. I think that would... Apparently, Judge Lynch has a bunch of subscriptions like that. That would create a duty to give a further understanding to the business. So you think it still would be a misrepresentation? Yes. If they said we have these subscribers, if they knew that a lot of them weren't engaging with the product, then the statement that we have this number of subscribers, which is not itself inaccurate, would become inaccurate if they knew that there were inaccurate subscribers. We would contend with such... Actually, you're saying that the fraudulent scheme has nothing even to do with the case. No, it... Just the usage data alone would render the statement... It makes it even more fraudulent when you actually have a scenario where nationally, discussed at national meetings, according to CW57, at national meetings, ghost accounts were discussed. Director of Sales are discussing ghost accounts. They're not talking about non-usage. They're discussing a ghost account scheme that triggers an internal investigation. At that stage, all the defendants could have said was, we have a million users, or 1.5 million users, but we have an internal investigation into these users, because the usage seems extremely slow, and we have a significant amount of reports, 58 witnesses, that say these are ghost accounts. That would give investors a full view... Right now, we've kept you up past your initial time. We'll hear from you back. You've reserved three minutes for rebuttal. Why don't we hear from the appellee, Mr. Monahan. Thank you. Thank you, Your Honors. Bill Monahan from Sullivan and Cromwell for the defendants' appellees. For Your Honors to reverse Judge Caproni here, you would need to find that in her 70 pages of two opinions in which she went confidential witness by confidential witness, statement by statement, Judge Caproni essentially got everything wrong, scienter, materiality, and falsity. If Your Honors find that she got any of those correct... We can read a long opinion and figure out whether it's right or wrong. For sure. Sometimes there are mistakes in long opinions. For sure, Your Honor. And you're right. If any one of these three things is insufficiently alleged, then you win. That's correct, Your Honor. So let's talk about them. Sounds good, Your Honor. There are no allegations, including from their confidential witnesses, that anyone responsible for the statements, anybody who was involved in drafting the statements or the disclosures, any of the senior executives knew contrary information at the time of their statements. Mr. Lieberman referenced there at the end that there was a discussion at a management meeting about the investigation in order to, I think, suggest that senior executives were apprised of the investigation and knew something inconsistent with their statements. That's actually incorrect. If you look at the allegation he's referring to, confidential witness 57, that's in A811, paragraph 434 of their complaint. It alleges that the investigation was discussed with company officials, and then if you look there, the word top is actually stricken through. They've actually taken the time to strike through the word top there, thereby conceding that top company officials were not there. Piggybacking on some of the points Judge Lynch and Judge Monash made, reports of low DTVN usage is not fraud. It's not a fraudulent account. The market at that time and now was saturated with competitor video streaming products and a limited So, in fact, if the executives making the statements said we have this number of subscriptions and they knew that 97% of them were inactive, would that be a misleading statement? No, I don't believe so, Your Honor, because inactive subscriptions, I want to talk about the 97%, but inactive is not a fraudulent account. It's not a non-subscription. People sign up and they don't use it. So that's how it would be active.  And they knew that 97% of them had been created without the user's knowledge. Would that be a misleading statement? That could be. That's much closer, Your Honor, I think. But, you know, the facts here are a bit different. On this 97% point, Your Honor, I'm looking at paragraph 116, page A715 that Mr. Lieberman referenced. And what we have there is confidential witness 34. The person here was a store manager at a retail location in Northern California. I think it's hard to reach an inference that this person and his or her speculation about 97% at any given moment in time. It's not alleged to be a speculation. It's alleged that there was a computer program at which this person, and I think he says something like any person in the company, could look it up and see what the number was. He says at one point it was 97%. It's clear, the context is pretty clear, it seems to me that he is purporting to say that I looked at actual company data and this is what it says. It's not like a company manager, at least the allegation is, not that somebody who managed a store says 95% of this is just crap. You know, out of his head because he did a bunch of fraudulent things himself. That's not what's alleged here anyway. Understood, Your Honor. And I suppose my point is that what we're talking about here is a person at a store in California, not a senior executive, not anyone responsible. Even if there was access at the entire company to these usage reports, I would note confidential witness 34 is the only one of their 70 confidential witnesses who even mentions it. But even if there is access across the company to this, the usage is not inconsistent with fraud. Is not inconsistent with fraud. Consistent with fraud, I'm sorry. And in any event, I lost track of that point, but- I think you're saying that because there's one store manager in Northern California, we can infer that 97% of the accounts were fraudulent. Certainly not. I mean, even at most you could, I guess- But isn't that a data point that does suggest that a very large number of the accounts were fraudulent? No, I don't think so, Your Honor. It might suggest low usage at a particular moment in time or no usage at a particular moment in time, perhaps after the World Cup ends and people are not canceling their subscription to whatever video streaming service. It is a time. That, I think, is a significant matter. He says it was 97% at one time. But if you take it all together and you tie together that there is information that, at least at some points, a really huge number of the people who are subscribers are not using it at all. With the information that there was a nationwide investigation that led to firing hundreds or even over a thousand people for creating fraudulent accounts or accounts where the customers didn't know they were signing up or that in some other way was misconduct that led to firing. At some point, don't you have to draw an inference that people- How could the top management of the company not know that this kind of stuff is going on and that that could raise some serious questions about how well they're doing? I suppose, Your Honor, I have a couple of responses on that. First is in terms of how could the top management not know. We're talking about a product here, DirecTV Now, that at no time in its existence exceeded, I believe, 0.8% of AT&T's subscribers, total subscribers. So I think that goes a long way to show why the top management may have not been following along on usage. The second point, Your Honor- Well, but then again, it may be a small part of the business at this point. But there was this whole hoopla at the time of the merger with Time Warner that this is the product of the future. This is what we're hanging our hat on growth, and it's because we're getting this great synergy by acquiring a company that has a lot of product and acquiring a service that can be fed by that product. And that's a great thing. And at some point, eventually, it doesn't work out. Now, that's not evidence of fraud. Lots of products don't work out.  But you don't think someone was paying attention to whether this product is looking like the product of the future or not? Well, two points on that, Your Honor. Paying attention maybe to certain- There's really no specificity in terms of paying attention to how sales are generated or improper sales practices. There's no evidence of any of the senior- Until there's an investigation. I mean, is there an allegation about exactly when that takes place? The investigation is alleged to start in mid-2017, and then it wraps up. I think there's some inconsistent allegation sometime in October of 2018. But to your point about the merger, Your Honor, all of that was about the future performance of video streaming after the merger. There is nothing. And it's sort of awkward for me to point to the first three pages of their reply brief and all the statements they identify there. Some of my most favorite statements in the case. Now, they excerpt them, and there's eight ellipses and whatnot in there. But if you actually read those statements, they don't say that the performance of DTVN prior to the merger mattered in any way to anyone or about the merger or to Time Warner or to Time Warner shareholders. It was about the future performance of video streaming, of which DirecTV Now was a part. There was also WatchTV, U-verse, eventually HBO Max, after AT&T was able to acquire what it hoped to acquire, which was the premium video content from Time Warner. And then pair that premium video content with these streaming services. They said we're going to thin out the margins. It's going to become profitable because we have this model that's going to succeed, right? That's correct, Your Honor. And that depends on the subscription numbers, doesn't it? In what sense? I'm sorry. I don't follow. You know, I mean, the predictions of future success does depend on increasing subscriptions. No, no. Exactly, Your Honor. Mostly, if you look at the statements, it depends on lowering the content costs after you acquire the Time Warner content in the future. What's the point of that? I mean, no one wants to have a product that has very low profit margins, but we also don't sell many of them, right? The idea is you have low profit margins, but you can make it up on volume, right? Well, certainly the company wanted to make it up on volume, but I think my point is that that was all forward looking. Look, but let's not play fast and loose with what they're actually alleging. There are two separate things, right? They have a bunch of statements that they say are fraudulent because they are reporting profitability when virtually all of them are at such a stage when they both are formulated as predictions of the future and they couldn't be anything else but predictions of the future because of when they're happening. And you've got a nascent product. So, okay, put that to one side. But what he's hanging his hat on here, particularly today, is the second bunch of statements that are about subscribers. And what, you know, I think what we're asking about is, okay, this is a lift for them. But the concept, anyway, of the complaint is that they're reporting, in effect, success in this strategy over time, that we actually are adding subscribers at a great rate. And he's saying that the company leadership had to know, based on the fact that this was supposed to be an important thing for the future, that they had to fire a whole bunch of people because they were creating ghost accounts. And let's say 97% of the customers aren't actually using it, which does not bode well for the future. Sooner or later, even a rich guy like me that is very lazy about cutting costs like this is going to figure out that if I haven't used this in a year, it really should go. So, I mean, that's the theory. So the stuff about the future is, at least in this presentation today, not the thing they're hanging their hat on, that those were fraudulent statements, but is the context for drawing certain inferences about what the leadership might have known. I understood, Your Honor. What I would point to, and I think you made this point during Mr. Lieberman's remarks, is the nature of the allegations here about those subscribers and the nature of the purported incentives for sales reps to commit this sales fraud was just to sign up. It doesn't matter when you cancel. They allege prompt. They allege even simultaneous cancellations. And so there's no reason to think that the reported subscriber figures, which were net of cancellations in a quarter, would have been inflated. Certainly no evidence to think that any senior executives or anybody else saw that, knew that. No documents. Usage is not the same. I see I'm out of time, Your Honor. I'm happy to answer any more questions. But you're saying that there aren't enough ghost accounts? So, like, if we're extracting from those where somebody might have engaged in it or even where there was a cancellation within a quarter, you're just saying there isn't enough evidence of accounts where somebody used a fake e-mail address or created an account without the customer's knowledge to inflate the numbers? I don't think that's – that's not my position, Your Honor. My position is instead that Judge Caproni said in her first decision that there may be these ghost or fake accounts. They've changed the names. But how many were canceled? What percent was canceled? You allege that these were promptly canceled. They wouldn't have been reported in the subscriber figures that the company disclosed. Do something about it in your second amended complaint. They ignored it. There's no – there's no percentage. There's no estimate. There's no extrapolation. And there's certainly, again, nothing to think that the senior executives – Okay, but then just to clarify, so if, in fact, there was a large number of ghost accounts, would that make the statements misleading? No, I don't believe so, Your Honor, because we were – Let's say – let's say 70 percent of the accounts were ghost accounts where the subscriber had no idea he even had an account. I think, Your Honor, that they effectively allege that or at least some of the confidential witnesses do. But, again, I'm back to the way we reported or AT&T reported its subscriber figures. Net of cancellations. There was no restatement here. There is no allegation that the government – No, I guess what you're saying – you're saying, well, they haven't established that the ghost accounts would have affected the numbers that were reported. Correct. Because they might have been canceled out and so on. Correct. That's what you're saying. I'm asking, well, if, in fact, they had evidence to show that it was included in the numbers because there was some evidence that, you know, the ghost accounts lasted more than one quarter and so actually the numbers were – report – didn't include, you know, 50 percent ghost accounts. Would that be a misleading statement? It might get to materiality. It could get there in terms of a material and misleading statement about the subscriber numbers. It would not address the Sienter issue at all, and they do not plead that. It wouldn't address the Sienter issue. But, okay, but you're saying that the reason why they can't identify a misleading statement is not because it wouldn't be non-misleading even if there were a large number of ghost accounts. It's that they don't make a connection between the scheme to sign people up fraudulently for ghost accounts and the actual numbers. I think that's correct. Because you think the way the numbers were reported might have filtered out all of the ghost accounts. And, in fact, I think the allegation suggests that they did filter out prompt and simultaneous cancellations. Well, you know, I think you may be trying to establish more than you need to, right? I mean it doesn't have to be that all the ghost accounts canceled effectively immediately or within a quarter because what they're really alleging is that there's a repeated – every month, every quarter anyway, at least I have a chart of every quarter, they report – your client reports this many new subscribers net over the last quarter. Correct. And they fluctuate considerably. They're not all great quarters and some of them are pretty small numbers and some of them are big numbers. But for the ghost accounts to be having a meaningful impact on that – those numbers over time, they have to be continual, right? Because even if in a given quarter some of the ghost accounts persist longer than a quarter, one of two things has to happen. Sooner or later they get canceled and they drop out. And if last quarter there was a lot of fraud and of those 200,000 new additions, 100,000 of them fall out. Then the next month's number is either going to be accurate because everybody canceled or if it's a big number, it may be accurate because those people, however fraudulently signed up, continued to pay. But in order for the ghost accounts to be a significant factor consistently over this period, sooner or later those ghost accounts are going to show up and the numbers are going to crash. I agree, Your Honor. I agree. Okay. I think we have your argument. Thank you very much. Thank you, Your Honor. Mr. Lieberman, you've reserved three minutes. Your Honor, to hit the very last point that Mr. Monahan agreed with, CW39 said that he was told by his Director of Sales to not cancel too quickly so the numbers would show up. And so that's, CW39 advised the Director of Sales, Jacob Mitchell, directed him to be sure not to cancel newly created accounts too soon, otherwise they would not be counted towards their sales metrics. Yeah, but if you look at the numbers, you know, the net additions from fourth quarter 2016 to third quarter 2018, it goes $200,000, $72,000, $152,000, $296,000, $368,000, that was a good quarter, then down to $300,000 again for a couple of quarters and then way down after that. So we're trying to figure out how long could these ghost accounts possibly go on? People are being billed for this every month. So is there any evidence that throughout this period, not just at a certain point and then they investigate and they close it down, but consistently all these numbers are going to be materially impacted by ghost accounts? Did 97% of these people never pay anything? Whether they paid anything or knew they were paying anything is the question. Well, what if they didn't know they were paying anything? I mean, then they're doing a tremendous job of consumer fraud. They certainly were, Your Honor. That's what we allege. How is the stock being affected by this? How is the stock affected? Exactly. Once the internal investigation ends, what occurs to the stock and what occurs to the accounts, all of a sudden they fall on a cliff. It ends in 2018. The growth ends on a cliff in the third quarter of 2018. That seems right. Yes. Only 49,000 new accounts, but that's still net increase over the previous quarter, over the previous quarter, over the previous quarter. And in January 2019, it declines. Actually, the net growth starts to decline in 2019, and they fold up the products because what happens is the internal investigation occurs, it concludes, and they say the gig is up, you can't do this anymore. Nothing else is going on in the economy at that period that affects streaming services. I mean, come on. Your Honor, we have allegations of a nationwide scheme. We have allegations of internal investigation, none of which is disclosed. And all of a sudden, once that starts to come to light, all of a sudden growth completely halts. Shocking analysts. There was no other explanation given by the company for the decrease in growth. So what's happening with these accounts that persist over quarters? So Judge Lynch was saying, well, at some time, people are just paying their bills. Are they paying their bills? You can have some people paying their bills, figuring it out after a few months. Oh, my goodness, I'm being charged. They cancel, but these account representatives are just creating more and more fake accounts for others, but with fake e-mails and fake e-mail addresses, and they continue the fraud and increase the fraud. I mean, it's a product that just starts. So you're going to have, when you're starting a fraud, you're going to have explosive growth. The company says, got to stop it because this is getting out of hand. They fire 1,000 people. All of a sudden, within a few quarters, the product is dead. That is a story here, Your Honor. And that's a compelling story of a fraud here. That is what happens. It's not like, and Mr. Monahan's benign gloss on the importance of this product to the company. In November 2018. I think we understand the importance to the company. You've laid this out in your brief. Can I just circle back just for one second to the Center question? Sure. So you were saying the reason why the leadership of the company would have known about this is because they had access to the usage reports. Is that right? They initiated an internal investigation. That's how they knew about it. Yeah, but initiating an internal investigation, does that suggest that they didn't know about it? And then when they found out, they launched an investigation? Like, why does that tell us that they knew about it? Why didn't they disclose the investigation? When they're saying there's explosive growth, why are they disclosing there's an investigation into the source of that growth? So you're saying the statements that were made contemporaneously with the investigation. For sure. At that stage, that's the answer. Absolutely. Even beforehand, we would say, but absolutely at the time of the investigation. So why beforehand? Why beforehand? Because you would look at 97% and you'd say, wow, this product is really successful. But there's no indication of when the 97%, that was an allegation that at one time, one guy looked at one report, unspecified time, and found this 97% number. So, Your Honor, let's focus then on the internal investigation. And by the time this hits an internal investigation, that has to be a corporate action that launches an internal investigation. So they find out that there's a bunch of people doing frauds and they stop them. Why don't they tell the market that? Why don't they tell the market at the same time this is such a successful project? And they is a rather undifferentiated word. We're pursuing AT&T, and AT&T has a duty, if they launch an internal investigation and their representatives are saying, we are But their representatives, again, if you're imputing knowledge of certain things to certain people, actions to different people, you can't just kind of mush it all together. Sure. And that there's sort of this undifferentiated scienter, right? I would say that the inference that the corporate, the CEO of the company, would not know that an internal investigation on the most important product of the merger is simply implausible. I think we have your argument. We've kept you up past your time. So thank you very much to both of you. Very well argued. Thank you. Very helpful. And we will turn to the next case in the docket, Nuance Communications versus IBM, which is 21-1758. Thank you, Congressman. Thank you, both of you. Thank you. We'll let everybody have a minute to get settled at the table. Yes. Thank you. Okay. So we have Mr. Silber for the appellant, and I understand you would like to reserve three minutes for rebuttal. Is that right? That's correct. Thank you. You may proceed. Thank you. Good morning, and may it please the court, Greg Silber for Nuance. IBM's principal argument is that willful blindness was not necessary to the district court's conclusion that the claims were time-barred. But what the district court tells us at page five of its decision is that the outcome of the case turns on its determination that Nuance was willfully blind. And if that's not clear enough, the court's analysis of the time-bar is contained in sections of the opinion that are headed, the willful blindness doctrine and applying the doctrine. And then the court's ultimate conclusion, which you find at pages 58 and 59 of the special appendix, are number one. Okay, but we can affirm based on anything that's in the record, right? So the district court does make findings that say that Nuance was aware that IBM was producing updates in IBM software and that IBM was not sharing those updates with Nuance. Why isn't that enough to say that Nuance was aware? If you just took out the willful blindness stuff, wouldn't that be enough? It wouldn't, Your Honor, for two reasons, both of which are important. Number one, this is a judgment after a bench trial, and actual knowledge is a fact issue. So the district court sits as a finder of fact. This court doesn't. And if the district court does not find actual knowledge, which it didn't, then I don't believe that this court can find it. How do you do that? Page 53. Yes. I'm looking at the last sentence. Therefore, the court finds by preponderance of the evidence that Nuance knew IBM was withholding code developed by IBM software. Yeah. It says that, right? It just says that. Knew. Yeah. Okay, not ought to have known. So, again, didn't they? And that's backed up. And that's the conclusion of about five pages, starting on page 48 of the opinion, that lists a rather remarkable list of reasons why that support, that Nuance actually knew that IBM was withholding code developed by IBM software. In connection with responding to Judge Lynch, I'm also looking at page 48, which precedes the list, where, again, the judge says the following evidence shows Nuance knew IBM software was creating updates, et cetera. So how do we, are you suggesting the district court did not actually make a finding, despite those two sentences on that long list, of actual knowledge? The district court clearly did not make a finding of actual knowledge. It says that on page 54. It tells us what its finding was. We knew of a substantial possibility of breach, but not that we knew of breach. And let me walk through those bullets, starting at – So where does it say that – I understand it talks about it makes findings that Nuance was willfully blind, but where does it say in those findings, as I think you just suggested – Well, at pages – What the district court finds at pages 54 and 58 of the decision are that Nuance knew of a possibility of breach, and at that – But it already said it also knew. So let me – You make some findings. Hang on, let me just finish this one question. Yeah. Isn't it perfectly consistent for a district court to basically make two mutually reinforcing factual findings? Number one, you knew. And number two, you also knew of the significant possibility of something, and then you also didn't take steps to confirm it. Those are two perfectly consistent things that can coexist, right? If the first one were true, the second one would be irrelevant.